# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **NOBLE CAPTIAL GROUP, LLC AND NOBEL CAPTIAL FUND MANAGEMENT, LLC,** | § § § | |
| *Plaintiffs* | § | **Case No.  A-19-CV-1255-LY** |
| | § | |
| **v.** | § | |
| | § | |
| **US CAPITAL PARTNERS, INC., JEFFREY SWEENEY, CHARELS TOWLE AND PATRICK STEELE,** | § § § § | |
| *Defendants* | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO: THE HONORABLE LEE YEAKEL**
   **UNITED STATES DISTRICT JUDGE**

Before this Court are Defendants' Motion to Compel Arbitration and Stay Proceedings, or Alternatively Motion to Dismiss, filed on March 4, 2020 (Dkt. No. 17); Plaintiffs' Response, filed on March 18, 2020 (Dkt. No. 19); and Defendants' Reply, filed on April 1, 2020 (Dkt. No. 22). On April 2, 2020, the District Court referred the motions and related filings to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas.

## I. Background

### A. Factual Background

Plaintiff Noble Capital Group, LLC, a Texas limited liability company with its principal place of business in Austin, Texas, is a private lending organization. Plaintiff Noble Capital Fund Management, LLC ("NCFM") is the "operations arm" and a subsidiary/affiliate of Noble Capital Group. Dkt. No. 14 at ¶ 6. Together, Noble Capital Group and NCFM are referred to as "Plaintiffs."

1

Defendant US Capital Partners, Inc. ("USCP"), a California corporation, is in the business of providing financial advisory services. USCP is an affiliate of US Capital Global Group, the "flagship brand" under which a group of San Francisco-based companies operate. Those companies include US Capital Investment Management, LLC, an investment management affiliate, and US Capital Group Securities, a broker-dealer affiliate. Dkt. No. 17 at 3. Defendants Jeffrey Sweeney, Charles Towle, and Patrick Steele ("Individual Defendants"), also California residents, are partners and principals of USCP and/or the related entities.

In 2016, Plaintiffs met with USCP to discuss the possibility of establishing an investment fund; USCP would administer the fund and Plaintiffs would manage its investments. Plaintiffs allege that the Individual Defendants "made a whole host of fraudulent representations . . . to induce Noble to place investor dollars with a US Capital affiliate" and "to secure Noble's agreement to establish the Fund." Dkt. No. 14 at ¶¶ 8, 12.

A series of agreements followed. On August 16, 2016, NCFM and USCP entered into a letter agreement providing that USCP would act as financial advisor to NCFM in connection with NCFM's "objective to raise up to $50,000,000 in equity and debt" in exchange for a commission. Dkt. No. 17-3 at 1 (the "2016 Agreement"). The 2016 Agreement included an arbitration clause requiring the parties to arbitrate any claims related to the agreement. *Id.* at 4. Subsequently, the parties created the "US Capital/Noble Capital Texas Real Estate Income Fund, LP (the "Fund"), a $25 million private investment fund that invests in the Texas residential real estate market through short-term "fix-and-flip" rehab loans. Dkt. No. 1-1 at 8. On January 18, 2017, the Fund, NCFM, and US Capital Investment Management (USCP's investment management affiliate) entered into a Management Advisory Services Agreement ("MASA") providing that NCFM would manage the Fund's investments. Dkt. No. 17-4 at 1. The MASA also contained an arbitration clause. *Id.* at 5.

On February 3, 2017, NCFM and US Capital Group Securities (USCP's broker-dealer affiliate) executed another letter agreement (the "2017 Agreement"), which provided that US Capital Group Securities would "act as exclusive Placement Agent" to the Fund "for a private placement transaction . . . offering of securities of up to Two Hundred and Fifty Million US Dollars ($250,000,000)." Dkt. No. 17-5 at 1. This agreement also contained an arbitration clause. *Id.* at 5.

Plaintiffs allege that, almost immediately after the Fund was established, they became concerned that USCP and the Individual Defendants "were not delivering on their promises, including the promise that they would raise significant capital for the Fund." Dkt. No. 14 at ¶ 14. Plaintiffs allege that USCP told them to raise the Fund's seed capital from their own investor networks and USCP would obtain other investors to follow. Plaintiffs allege that they sourced $25 million from their longtime clients, but USCP failed to raise any capital for the Fund.

According to Plaintiffs, Defendants "then began efforts to string Noble along so they could continue to extract fees from the Fund." *Id.* Specifically, Plaintiffs contend that Defendants falsely told them that investors would participate in the Fund if Plaintiffs raised ever increasing amounts of money, completed an audit, and hosted and paid for several marketing events. Plaintiffs aver that they did all of this, but Defendants failed to deliver any investors. Plaintiffs also allege that Defendants continued to collect exorbitant fees, despite failing to deliver any investors as promised. In late 2018, Plaintiffs stopped paying fees to Defendants.

### B. Procedural Background

On January 16, 2019, NCFM filed an arbitration proceeding against US Capital Investment Management in San Francisco, California, pursuant to the arbitration clause in the MASA, asserting many of the same allegations as in this lawsuit. *See* Dkt. No. 1-1 (JAMS Arbitration

No. 1100104841). Although the arbitrator issued an emergency award granting NCFM some relief, a final arbitration award has not been issued. *Id.*

On May 20, 2019, the Fund filed a lawsuit in the Northern District of California against Noble Capital Group, NCFM, and numerous other entities and individuals, alleging fraud, false advertising, unfair competition, breach of contract, conversion, unjust enrichment, intentional interference with contractual relations, and Civil RICO, and demanding an accounting. *US Capital/Noble Cap. Tex. Real Estate Income Fund v. Newman*, No. 3:19-cv-2750 (N.D. Cal. May 20, 2019); Dkt. No. 26-1. On July 22, 2019, the District Court for the Northern District of California referred that case to arbitration (to be consolidated with JAMS Arbitration No. 1100104841) and entered a stay. Dkt. No. 25 in No. 3:19-cv-2750. The arbitrator has yet to enter a final arbitration award in the consolidated case. *Id.* at Dkt. No. 27.

On February 21, 2020, US Capital Group Securities filed an arbitration proceeding against Noble Capital Group, NCFM, and two other entities. FINRA Case No. 20-00631; Dkt. No. 26.

On December 27, 2019, Plaintiffs filed this suit against USCP and the Individual Defendants, alleging fraud and conspiracy. Dkt. No. 1. In response, Defendants filed a Motion to Compel Arbitration and Stay Proceedings. Dkt. No. 8. In reply, Plaintiffs filed their First Amended Complaint, alleging fraud, fraudulent inducement, and conspiracy. Dkt. No. 14. In light of the First Amended Complaint, on February 24, 2020, the District Court dismissed the first Motion to Compel Arbitration and Stay Proceedings without prejudice. Dkt. No. 16.

In the instant Motion to Compel Arbitration, Defendants argue that the Court should compel the parties to arbitrate pursuant to the multiple arbitration clauses in their agreements. Plaintiffs oppose the Motion, contending that the arbitration clauses at issue are unenforceable because they were fraudulently procured and that not all of the parties are bound by the agreements.

4

## II.  Legal Standards

Under the Federal Arbitration Act ("FAA"), parties to a contract may agree that an arbitrator rather than a court will resolve disputes arising out of the contract. *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019). The FAA provides that written agreements to arbitrate controversies arising out of an existing contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The FAA was designed to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (cleaned up). Thus, the FAA establishes "a liberal federal policy favoring arbitration agreements" and "requires courts to enforce agreements to arbitrate according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 97 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Although there is a strong federal policy favoring arbitration, the policy does not apply to the determination of whether there is a valid agreement to arbitrate between the parties. *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003). The FAA "does not require parties to arbitrate when they have not agreed to do so." *Volt*, 489 U.S. at 478. Rather, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960). The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt*, 489 U.S. at 478.

When considering a motion to compel arbitration, courts apply a two-step framework to determine whether a dispute must be arbitrated. First, the court must determine "whether the

5

parties entered into *any arbitration agreement at all*." *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). "This first step is a question of contract formation only—did the parties form a valid agreement to arbitrate some set of claims." *IQ Prods. Co. v. WD-40 Co.*, 871 F.3d 344, 348 (5th Cir. 2017), *cert. denied*, 138 S. Ct. 2620 (2018). This initial question is for the court. *Kubala*, 830 F.3d at 201; *see also 20/20 Commc'ns, Inc. v. Crawford*, 930 F.3d 715, 718 (5th Cir. 2019) ("[I]f parties dispute whether they in fact ever agreed to arbitrate at all, such questions of contract formation are considered 'gateway' issues that presumptively must be decided by courts, not arbitrators.") (quoting *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 68-69 (2010)).

In determining whether the parties entered into an arbitration agreement, courts distinguish between "validity" or "enforceability" challenges and "formation" or "existence" challenges. *Arnold v. Homeaway, Inc.*, 890 F.3d 546, 550 (5th Cir. 2018). "[W]here the 'very existence of a contract' containing the relevant arbitration agreement is called into question, the federal courts have authority and responsibility to decide the matter." *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004) (quoting *Will-Drill*, 352 F.3d at 218).

To determine whether there is a valid agreement to arbitrate, courts "apply ordinary state-law principles that govern the formation of contracts." *Webb v. Investacorp, Inc.*, 89 F.3d 252, 258 (5th Cir. 1996).[1] If the court finds there is a valid agreement to arbitrate, it moves to the second question: whether the claims at issue are covered by the arbitration agreement. *IQ Prods.*, 871 F.3d at 348. In the second step, the court must determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims." *Webb*, 89 F.3d at 258 (5th Cir. 1996) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985)).

---

[1] The parties agree that California law applies in this case. All of the agreements at issue contain choice of law provisions stating that California law controls. *See* Dkt. Nos. 17-3 at 4, 17-4 at 5, 17-5 at 5.

Where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes. *Kubala*, 830 F.3d at 201. A delegation clause is "an agreement to arbitrate threshold issues concerning the arbitration agreement." *Rent-A-Center*, 561 U.S. at 68. When a delegation clause is present, the court must address who decides whether the claim is arbitrable. *Kubala*, 830 F.3d at 202. Delegation clauses are enforceable and transfer the court's power to decide arbitrability questions to the arbitrator. The presence of a delegation clause obligates the court to "refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Id.*

Once the court determines that there is a valid arbitration agreement, the strong federal policy favoring the enforcement of the arbitration agreements applies, and all ambiguities must be resolved in favor of arbitration. *Banc One Acceptance Corp. v. Hill*, 367 F.3d 426, 429 (5th Cir. 2004). As the Supreme Court has stated: "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (quoting *United Steelworkers*, 363 U.S. at 582-83). The party seeking to compel arbitration must prove the existence of an agreement to arbitrate by a preponderance of the evidence. *Grant v. Houser*, 469 F. App'x. 310, 315 (5th Cir. 2012). Because of the strong presumption in favor of arbitration, the party opposing arbitration bears the burden to demonstrate either that the agreement is invalid or that the claims are outside of the agreement's scope. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004).

### III.  Analysis

Defendants rely on the arbitration clauses listed below contained in the parties' various agreements (the "Arbitration Agreements").

The 2016 Agreement between NCFM and USCP contains the following arbitration clause:

> Any dispute, claim, or controversy arising out of or relating to this Agreement, including the negotiation, breach, *validity* or performance of the Agreement, the rights and obligations contemplated by the Agreement, *any claims of fraud or fraud in the inducement*, and any claims related to the scope or applicability of this agreement to arbitrate, shall be resolved at the request of any party to this Agreement through a two-step dispute resolution process administered  by JAMS or another judicial and mediation service mutually acceptable to the parties involving first mediation, followed if necessary, by final and binding arbitration administered by a single JAMS arbitrator (the "Arbitrator") in San Francisco, California, pursuant to JAMS Comprehensive Arbitration Rules & Procedures.

Dkt. No. 17-3 at 4 (emphasis added).

The MASA between NCFM, the Fund, and US Capital Investment Management contains the following arbitration clause:

> Any dispute, claim, or controversy arising out of or relating to this Agreement, including the negotiation, breach, *validity* or performance of the Agreement, the rights and obligations contemplated by the Agreement, *any claims of fraud or fraud in the inducement*, and any claims related to the scope or applicability of this agreement to arbitrate, shall be resolved at the request  of any party to this Agreement through a two-step dispute resolution process administered by JAMS or another judicial and mediation service mutually acceptable to the parties involving first mediation, followed if necessary, by final and binding arbitration administered by a single JAMS arbitrator (the "Arbitrator") in San Francisco, California, pursuant to JAMS Comprehensive Arbitration Rules & Procedures.

Dkt. No. 17-4 at 5 (emphasis added).

The 2017 Agreement between NCFM and US Capital Group Securities contains the following arbitration clause:

> Any dispute, claim, or controversy arising out of or relating to the Agreement, including the negotiation, breach, *validity* or performance of the Agreement, the rights and obligations contemplated by the Agreement, *any claims of fraud or fraud in the inducement*, and any claims related to the scope or applicability of this agreement to arbitrate, shall be resolved solely and exclusively by binding arbitration administered by a single FINRA arbitrator (the "Arbitrator") in San Francisco, California, pursuant to FINRA Comprehensive Arbitration Rules & Procedures.

Dkt. No. 17-5 at 5 (emphasis added).

The Arbitration Agreements provide that any dispute, including claims of fraud and fraudulent inducement, arising out of or related to the agreements will be referred to arbitration in accordance with the rules and procedures of the AAA or FINRA. In addition, the Arbitration Agreements contain delegation clauses delegating to the arbitrator the "validity" of the agreements and any claims of "fraud or fraud in the inducement." *See Bowles v. OneMain Fin. Grp., L.L.C.*, 954 F.3d 722 (5th Cir. 2020) (finding that statement that "any legal dispute . . . arising out of, relating to, or concerning the validity, enforceability or breach of this Agreement, shall be resolved by final and binding arbitration" was a delegation clause); *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (holding that incorporation of AAA Arbitration Rules into the arbitration agreement presented "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability").

Defendants argue that the parties are bound by these arbitration clauses and this case must be compelled to arbitration. Plaintiffs do not dispute that their claims fall within the Arbitration Agreements, but argue that the agreements are not enforceable because (1) the arbitration clauses were fraudulently procured, and (2) not all parties to this case were signatories to the agreements. The Court addresses each of these arguments in turn.

### A.  Enforceability of the Arbitration Agreements

In their original complaint, Plaintiffs alleged only that Defendants fraudulently induced them to enter into their agreements; they did not specifically allege that that Defendants fraudulently induced them to assent to the Arbitration Clauses in those agreements. After the Defendants filed their first motion to compel arbitration, Plaintiffs filed their First Amended Complaint, arguing for the first time that Defendants fraudulently induced Plaintiffs to assent to the arbitration clauses in the agreements by failing to tell them that Defendants "had a lengthy history of both litigation and (on information and belief) confidential arbitration actions." Dkt. No. 14 at ¶ 33. Plaintiffs contend that if they had "known the truth," they "would not have agreed to either the confidential arbitration clause or to do business with US Capital." *Id.*

The Court finds that based on the delegation provisions in the agreements, the arbitrator has exclusive authority to resolve any disputes about the enforceability of the agreements, including Plaintiffs' claim that they were fraudulently induced into entering the arbitration clauses. The FAA provides that arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA thereby places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms. *Rent-A-Center,* 561 U.S. at 67-68. Like other contracts, however, they may be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

Challenges to the validity of arbitration agreements "upon such grounds as exist at law or in equity for the revocation of any contract" can be divided into two types:

> One type challenges specifically the validity of the agreement to
> arbitrate. The other challenges the contract as a whole, either on a
> ground that directly affects the entire agreement (e.g., the agreement
> was fraudulently induced), or on the ground that the illegality of one
> of the contract's provisions renders the whole contract invalid.

*Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 (2006) (citation omitted).

In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), the Supreme Court addressed the question of who—court or arbitrator—decides these two types of challenges. The issue in that case was "whether a claim of fraud in the inducement of the entire contract is to be resolved by the federal court, or whether the matter is to be referred to the arbitrators." *Id.* at 402. Guided by § 4 of the FAA, the Court held that

> if the claim is fraud in the inducement of the arbitration clause
> itself—an issue which goes to the making of the agreement to
> arbitrate—the federal court may proceed to adjudicate it. But the
> statutory language does not permit the federal court to consider
> claims of fraud in the inducement of the contract generally.

*Id.* at 403-04 (cleaned up).

Some 40 years later, in *Buckeye Check Cashing*, the Supreme Court held that "regardless of whether the challenge is brought in federal or state court, a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." 546 U.S. at 449. The Court explained that "as a matter of substantive federal arbitration law . . . an arbitration provision is severable from the remainder of the contract," and "unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance." *Id.* at 445-56.

The Supreme Court elaborated further in *Rent-A-Center,* 561 U.S. at 65. In that case, the plaintiff filed an employment discrimination claim against his former employer, who then moved to compel arbitration based on an arbitration agreement containing a purported delegation provision. *Id.* The plaintiff opposed arbitration, arguing that the arbitration agreement was

unconscionable and, therefore, unenforceable under state law. *Id.* at 66. The defendant contended, based on the delegation provision, that the arbitrator had exclusive authority to resolve any dispute about the enforceability of the agreement. *Id.* The Court agreed, explaining that if a party challenges the validity of the agreement to arbitrate, the federal court must consider the challenge; but unless the party resisting arbitration has "challenged the delegation provision specifically, we must treat it as valid . . . leaving any challenge to the validity of the Agreement as a whole for the arbitrator." *Id.* at 71-72. The Court concluded that the plaintiff focused his unconscionability argument on the arbitration agreement as a whole, rather than the delegation clause in particular, and therefore the question of the arbitration agreement's validity was for the arbitrator to decide. *Id.* at 74-76. Thus, *Rent-A-Center* holds that, in the absence of a challenge specifically to a delegation clause, validity challenges must be sent to an arbitrator. *Id.* at 71-72.

Here, as in *Rent-A-Center*, Plaintiffs' fraudulent inducement claim focuses on the Arbitration Agreements as a whole, rather than the delegation clauses in particular. Because Plaintiffs are not specifically challenging the delegation clauses, Plaintiffs' enforceability challenges must be sent to the arbitrator. *See Arnold v. HomeAway, Inc.*, 890 F.3d 546, 554 (5th Cir. 2018) ("Arnold's contention is that the arbitration provision as a whole is unenforceable under Texas law. Because his challenge is not specific to the delegation clause, Arnold must present it to an arbitrator."); *Gay v. Manchester Mgmt., LLC*, 2018 WL 5255267, at *5 (N.D. Tex. Oct. 22, 2018) ("Gay does not challenge the validity of the delegation clause specifically. For this reason, the court concludes that the unconscionability issues she raises are for the arbitrator, not the court, to resolve."). Accordingly, the question of the Arbitration Agreements' validity is for the arbitrator to decide, not this Court.

**B.  Applicability of the Arbitration Agreements**

Plaintiffs also argue that the Arbitration Agreements are not enforceable because Noble Capital

Group and the Individual Defendants were not signatories to the agreements. When parties dispute

whether a non-signatory can compel arbitration pursuant to an arbitration clause, their dispute

questions the existence of a valid arbitration clause between specific parties and "is therefore a

gateway matter for the court to decide. Although arbitration agreements apply to non-signatories

only in rare circumstances, the question of who is actually bound by an arbitration agreement is

ultimately a function of the intent of the parties, as expressed in the terms of the agreement."

*Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 530 (5th Cir. 2019)

(cleaned up).

Courts addressing whether a non-signatory can enforce an arbitration agreement are guided by

traditional principles of state law, which allow a contract to be enforced by or against nonparties

to the contract through assumption, piercing the corporate veil, alter ego, incorporation by

reference, third-party beneficiary theories, waiver, and estoppel. *Arthur Andersen LLP v. Carlisle*,

556 U.S. 624, 631 (2009) (holding that "the Sixth Circuit's holding that nonparties to a contract

are categorically barred from § 3 relief was error"); *see also Cohen v. TNP 2008 Participating

Notes Program, LLC*, 243 Cal. Rptr. 3d 340, 358 (Cal. Ct. App. 2019) (identifying six theories by

which a non-signatory may be bound to arbitrate: (a) incorporation by reference; (b) assumption;

(c) agency; (d) veil-piercing or alter ego; (e) estoppel; and (f) third-party beneficiary.). "Agency

principles have been held to permit nonsignatory corporations to compel arbitration under

arbitration clauses signed by their corporate parents, subsidiaries, or affiliates, at least when the

allegations against the nonsignatory corporation do not differ substantially from those against its

signatory affiliate." *Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 990 (N.D. Cal. 1996).

Although Noble Capital Group was not a signatory to the Arbitration Agreements, the agreements apply to NCFM and its "affiliates," "subsidiaries," "associated companies," "co-managed entities," "successors," and "assigns." Dkt. Nos. 17-3 at 1; 17-4 1, 4; 17-5 at 1. In their First Amended Complaint, Plaintiffs refer to NCFM and Noble Capital Group as the single entity "Noble," alleging that NCFM and Noble Capital Group are Texas companies with the same principal place of business and "are the parent company and operations arm of a private lending organization." Dkt. No. 22 at 1-3. Plaintiffs do not dispute that Noble Capital Group and NCFM are affiliates, associated companies, co-managed companies, or alter egos. Because NCFM entered into agreements that its affiliates, associated companies, and co-managed entities also would be bound by those agreements, Noble Capital Group is bound by them. *See Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 382 (5th Cir. 2008); *Fleetwood Enters., Inc. v. Gaskamp*, 280 F.3d 1069, 1075-76 (5th Cir. 2002) (noting that third parties may be bound by a contract if the intent to make a third party bound is "clearly written or evidenced in the contract").

Plaintiffs next argue that the they should not be compelled to arbitrate because the Individual Defendants were not parties to the Agreements but signed them in their corporate capacities. Under California law, courts generally do not compel corporate officers and directors to arbitrate claims arising from contracts signed in their representative capacities. *Cohen*, 243 Cal. Rptr. 3d at 358. There are exceptions to this rule, however. Courts have compelled non-signatory officers and employees to arbitrate claims alleged against them in their individual capacities even if they did not sign an arbitration agreement, or signed only as representatives of their employers or principals, where the officer or employee personally benefitted from the underlying contract. *See RN Sol., Inc. v. Catholic Healthcare,* 81 Cal. Rptr. 3d 892, 900 (Cal. Ct. App. 2008) (holding that

corporate officers who signed agreement in corporate capacity and "benefited financially and professionally" from agreement were bound by arbitration agreement and entitled to enforce it).

Here, the Individual Defendants, in their roles as corporate officers of the USCP entities, stood to benefit personally from the contracts at issue "as their compensation and reputations are determined based upon the business functions of the USCP-entities, including the execution of their contract agreements." Dkt. No. 22 at 10. The Court thus finds that the Individual Defendants are bound by the Arbitration Agreements and are entitled to enforce those agreements.

Even were the Individual Defendants not bound by the Arbitration Agreements, the Court finds that the doctrine of equitable estoppel compels arbitration in this case. "Equitable estoppel precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (cleaned up).[2] The Fifth Circuit has reasoned that the theory of estoppel applies when there is a "tight relatedness of the parties, contracts, and controversies," and has noted that courts have employed this exception to dismiss "strategic pleading" that seeks to avoid arbitration. *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 613 (5th Cir. 2016)

Equitable estoppel applies because the Individual Defendants, all corporate officers and employees of USCP, have an interconnected relationship with USCP. In their Amended Complaint, Plaintiffs make the same factual allegations against USCP and the Individual Defendants, and also allege that they were acting together as a single unit to make false

---

[2] Where a non-signatory seeks to enforce an arbitration clause, the doctrine of equitable estoppel applies in two circumstances: (1) when a signatory must rely on the terms of the written agreement in asserting its claims against the non-signatory or the claims are "intimately founded in and intertwined with" the underlying contract, and (2) when the signatory alleges substantially interdependent and concerted misconduct by the non-signatory and another signatory and "the allegations of interdependent misconduct [are] founded in or intimately connected with the obligations of the underlying agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128-29 (9th Cir. 2013) (citations omitted).

misrepresentations to induce Plaintiffs to enter into the Agreements and violate their terms. *See Hays*, 838 F.3d at 612 (noting that plaintiff treated signatory and non-signatory as indistinguishable single unit); *Smith/Enron Cogeneration Ltd. v. Smith Cogeneration Int'l*, 198 F.3d 88, 98 (2d Cir. 1999) (affirming arbitration order where plaintiff treated non-signatory companies and their signatory assignees as a "single unit in its complaint"); *Mayton v. Tempoe, LLC*, 2017 WL 2484849, at *6 (W.D. Tex. June 7, 2017) (compelling signatory to arbitration where claims against non-signatory were indistinguishable from claims against signatory and based on same contract); *Fin & Feather Chalets, LLC v. S. Energy Homes, Inc.*, 2014 WL 4354459, at *13 (E.D. La. Sept. 2, 2014) (finding that non-signatory may invoke equitable estoppel to compel arbitration where plaintiff did not distinguish the alleged misconduct of any defendant).

Requiring Plaintiffs to arbitrate under the facts of this case "makes sense because the parties resisting arbitration had expressly agreed to arbitrate claims of the very type that they asserted against the nonsignatory." *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 361 (5th Cir. 2003); *see also Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000) (stating that a plaintiff "cannot, on the one hand, seek to hold the nonsignatory liable pursuant to duties imposed by the agreement, which contains an arbitration provision, but, on the other hand, deny arbitration's applicability because the defendant is a non-signatory"). The Court also finds that it would be inequitable to permit NCFM to avoid the Arbitration Agreements when it relied on those clauses to initiate its own arbitration proceedings against US Capital Investment Management. *See Miller Weisbrod, LLP v. Klein Frank PC*, 2014 WL 3512994, at *6 (N.D. Tex. July 16, 2014) (finding that plaintiffs "will gain an unfair advantage in this litigation if not estoped because they have clearly shifted positions on the issue of whether they were parties to a written agreement solely for the purpose of defeating the instant motion for summary judgment").

### C.  Interests of Justice and Judicial Economy

Finally, the Court finds that compelling the parties to arbitration in this case would be in the interests of justice and judicial economy. As noted, the Northern District of California has ordered that a related lawsuit filed by the Fund against Noble Capital Group and NCFM be referred to arbitration and consolidated with the arbitration proceeding initiated by NCFM. The Court finds that the issues in this case too should be brought up in that consolidated arbitration proceeding.

### D.  Conclusion

Plaintiffs have failed to sustain their burden to demonstrate that the Agreements are invalid. *Carter*, 362 F.3d at 297. The Court finds that parties are bound by the Arbitration Agreements. Accordingly, Defendants' Motion to Compel Arbitration should be granted.

Once the court determines that a motion to compel arbitration should be granted, the FAA instructs the court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. The Fifth Circuit, however, has held that dismissal, as opposed to a stay pending arbitration, is proper "when *all* of the issues raised in the district court must be submitted to arbitration." *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir. 1992); *see also Griggs v. S.G.E. Mgmt., L.L.C.*, 905 F.3d 835, 839 (5th Cir. 2018) ("Some circuits have held that district courts must stay a case when all claims are submitted to arbitration, but this circuit allows district courts to dismiss such claims outright."). Because all of the issues Plaintiffs have raised in this case must be referred to arbitration, the Court recommends dismissal of this action.

## IV.  Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** that the District Court **GRANT** Defendants' Motion to Compel Arbitration (Dkt. No. 17) and **DISMISS** this case with prejudice.

**IT IS FURTHER ORDERED** that the Clerk **REMOVE** this case from the Magistrate Court's docket and **RETURN** it to docket of the Honorable Lee Yeakel.

## V.  Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on May 12, 2020.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE